**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) Case No. 15-11835 (SCC) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

| | |
|---|---|
| SABINE OIL & GAS CORPORATION, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Adversary Proceeding |
| | ) Case No. 16-01042 (SCC) |
| - against - | ) |
| | ) |
| HPIP GONZALES HOLDINGS, LLC, | ) |
| | ) |
| Defendant. | ) |

| | |
|---|---|
| SABINE OIL & GAS CORPORATION, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Adversary Proceeding |
| | ) Case No. 16-01043 (SCC) |
| - against - | ) |
| | ) |
| NORDHEIM EAGLE FORD GATHERING, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM DECISION ON (I) MOTIONS OF NORDHEIM EAGLE FORD GATHERING, LLC AND HPIP GONZALES HOLDINGS, LLC FOR JUDGMENT ON THE PLEADINGS AND (II) DEBTORS' OMNIBUS MOTION FOR SUMMARY JUDGMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is: 1415 Louisiana, Suite 1600, Houston, Texas 77002.

A P P E A R A N C E S:

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, NY 10022
By:    James H.M. Sprayregen, P.C.
       Paul M. Basta, P.C.
       Jonathan S. Henes, P.C.
       Christopher Marcus, P.C.

300 North LaSalle
Chicago, IL 60654
By:    Gabor Balassa, P.C.
       Ryan Blaine Bennett, Esq.
       A. Katrine Jakola, Esq.
       Devon M. Largio, Esq.
*Counsel to the Debtors*

BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Floor
New York, NY 10020
By:    Robert G. Burns, Esq.

711 Louisiana St., Suite 2300
Houston, TX 77002
By:    William A. (Trey) Wood III, Esq.
       Jason G. Cohen, Esq.
*Counsel to Nordheim Eagle Ford Gathering, LLC*

LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
By:    Keith A. Simon, Esq.
       Paul A. Serritella, Esq.
       Annemarie V. Reilly, Esq.
*Counsel to HPIP Gonzales Holdings, LLC*

**HONORABLE SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE:**


Before the Court are (i) the motions of Nordheim Eagle Ford Gathering, LLC

("Nordheim") and HPIP Gonzales Holdings, LLC ("HPIP"), respectively, for judgment on the

pleadings with respect to the claims for declaratory judgment brought by the Debtors in the

above-captioned adversary proceedings and the declaratory judgment counterclaims asserted by

Nordheim and HPIP[2] against the Debtors (respectively, the "Nordheim Motion" and the "HPIP

Motion," and together, the "Defendant Motions") and (ii) the Debtors' omnibus motion for

summary judgment with respect to their claims for declaratory judgment and Nordheim and

HPIP's declaratory judgment counterclaims (the "SJ Motion").  The Defendant Motions and the

SJ Motion seek resolution of the parties' dispute as to whether certain covenants in the Nordheim

Agreements (as defined below) and the HPIP Agreements (as defined below) "run with the land"

under Texas law as real covenants or as equitable servitudes.

This dispute initially arose when the Debtors filed their *Omnibus Motion for Entry of an*

*Order Authorizing Rejection of Certain Executory Contracts* pursuant to section 365 of the

Bankruptcy Code in their chapter 11 cases seeking to reject the Nordheim Agreements and the

HPIP Agreements (the "Rejection Motion").[3]  The Court granted the Rejection Motion,[4] but

concluded that, in the procedural context of a motion to reject an executory contract, it could not

---

[2] In addition to counterclaims for declaratory judgment, HPIP has asserted two additional counterclaims against the
Debtors for breach of contract and trespass.  Those claims are not covered by the HPIP Motion.
[3] Case No. 15-11835, ECF No. 371.
[4] *See Bench Decision on Debtors' Omnibus Motion to Authorize Rejection of Certain Executory Contracts*, dated
March 8, 2016, Case No. 15-11835, ECF No. 872, *In re Sabine Oil & Gas Corp.*, --B.R.--, 2016 WL 890299 (Bankr.
S.D.N.Y. Mar. 8, 2016), attached hereto as <u>Appendix A</u> (the "Rejection Decision").

make a final determination as to whether the covenants at issue were covenants "running with the land," consistent with the Second Circuit's decision in *Orion Pictures Corp. v. Showtime Networks*.[5]  In authorizing the rejection of the Nordheim Agreements and the HPIP Agreements, the Court provided its non-binding analysis on the "running with the land" issue, but noted that further proceedings would be necessary in order to enable the Court to render a binding ruling on the issue.  The Debtors then commenced these adversary proceedings against Nordheim and HPIP seeking a declaratory judgment that the covenants contained in the Nordheim Agreements and the HPIP Agreements do not run with the land.

For the reasons stated in the Rejection Decision,[6] and for the additional reasons stated herein, the Court finds that the covenants at issue do not run with the land either as real covenants or as equitable servitudes, and therefore it denies the Defendant Motions and grants the SJ Motion.

## Background

The Debtors are an independent energy company engaged in the acquisition, production, exploration, and development of onshore oil and natural gas properties in the United States.  On July 15, 2015, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code with this Court, and are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Familiarity with the

---

[5] *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993).

[6] *See* pp. 9-18 of the Rejection Decision.  The entirety of the Rejection Decision is incorporated by reference herein.

background of the Debtors' businesses and chapter 11 cases[7] and with the Rejection Decision is
assumed.

### A.  The Nordheim Agreements and the HPIP Agreements

One of the Debtors, Sabine Oil & Gas Corporation ("Sabine"), is a party to two contracts

with Nordheim, each dated January 23, 2014, relating to the gathering of gas and condensate

produced by Sabine from a designated area (the "Nordheim Agreements").  Sabine is also party

to two contracts with HPIP, one dated May 3, 2013 and the other dated as of May 2014, relating

to the gathering, handling, and disposal of oil, gas, and water produced by Sabine from a

designated area (the "HPIP Agreements").  In the Rejection Decision, the Court summarized

many of the central provisions of the Nordheim Agreements and the HPIP Agreements and

incorporates that summary by reference here.[8]

One of the Nordheim Agreements, the Gas Gathering Agreement, contemplates a

separate and subsequent conveyance from Sabine to Nordheim of a mutually agreed tract of land

in connection with Nordheim's construction and operation of a gathering system.  Pursuant to a

Warranty Deed dated March 11, 2014, Sabine conveyed to Nordheim approximately 17 acres of

a 38-acre surface tract that Sabine acquired in October 2013 (the "Nordheim Parcel") so that

Nordheim could construct a nearby gathering facility.  Also on March 11, 2014, Sabine

conveyed to Nordheim a Pipeline and Electrical Easement (the "Pipeline Easement"), which

granted Nordheim a 90-foot pipeline and electrical easement over the remaining 21 acres of the

---

[7] *See, generally*, Declaration of Michael Magilton (A) in Support of First Day Motions and (B) Pursuant to Local
Bankruptcy Rule 1007-2, Case No. 15-11835, ECF No. 3.
[8] *See* pp. 2-4 of the Rejection Decision.

3

Nordheim Parcel, so that Nordheim could install and operate two pipelines and one electrical utility line over that tract of land.

### B. Procedural History

On September 30, 2015, the Debtors filed the Rejection Motion.  By the Rejection Motion, the Debtors sought Court approval to reject the Nordheim Agreements and the HPIP Agreements pursuant to section 365(a) of the Bankruptcy Code.  On October 8, 2015, Nordheim and HPIP each filed an objection to that motion.[9]  On October 14, 2015, the Debtors filed an omnibus reply in support of the Rejection Motion.[10]  On January 8, 2016,[11] Nordheim filed a surreply,[12] and on January 22, 2016, the Debtors filed a response to Nordheim's surreply.[13]

The Court heard oral argument on the Rejection Motion on February 2, 2016.[14]  On March 8, 2016, the Court issued the Rejection Decision granting the Debtors' request for authority to reject the Nordheim Agreements and the HPIP Agreements.  Promptly thereafter, and consistent with *Orion*, the Debtors initiated two separate adversary proceedings – one against Nordheim and one against HPIP – by filing two one-count complaints, each seeking a declaratory judgment that the covenants at issue in the Nordheim Agreements and the HPIP Agreements, as applicable, do not run with the land.[15]

On April 4, 2016, Nordheim filed its Answer and Counterclaims against the Debtors.[16]

---

[9] Case No. 15-11835, ECF Nos. 386, 387.
[10] Case No. 15-11835, ECF No. 410.
[11] The hearing on the Rejection Motion was adjourned several times on consent of the parties.
[12] Case No. 15-11835, ECF No. 676.
[13] Case No. 15-11835, ECF No. 742.
[14] Case No. 15-11835, ECF No. 816 (Transcript of February 2, 2016 hearing).
[15] Adv. Pro. No. 16-01043, ECF No. 1; Adv. Pro. No. 16-01042, ECF No. 1.
[16] Adv. Pro. No. 16-01043, ECF No. 5.

Nordheim asserted two counterclaims against the Debtors, seeking declaratory judgments that (1) the Nordheim Agreements contain real covenants that "run with the land;" or (2) in the alternative, the Nordheim Agreements contain covenants that are equitable servitudes that run with the land. Nordheim also filed the Nordheim Motion, requesting that the Court enter judgment on the pleadings in its favor on all claims.[17]

On April 7, 2016, HPIP filed its Answer and Counterclaims against the Debtors, asserting four counterclaims against the Debtors. Like Nordheim, HPIP brought two counterclaims seeking declaratory judgments that the HPIP Agreements are real covenants that run with the land, or alternatively, that the HPIP Agreements are equitable servitudes.[18] HPIP also filed the HPIP Motion for judgment on the pleadings on its two declaratory judgment counterclaims against the Debtors.[19]

On April 11, 2016, the Debtors filed their SJ Motion,[20] asking the Court (1) to enter summary judgment for the Debtors on their declaratory judgment claims against Nordheim and HPIP; (2) to enter summary judgment for the Debtors on Nordheim's and HPIP's declaratory judgment counterclaims, and (3) to deny the Defendant Motions.

On April 15, 2016, Nordheim and HPIP each filed a reply in support of the Nordheim Motion and the HPIP Motion, respectively, and an opposition to the SJ Motion.[21] On April 19,

---

[17] Adv. Pro. No. 16-01043, ECF No. 7.
[18] Adv. Pro. No. 16-01042, ECF No. 8. HPIP's two additional counterclaims against the Debtors, one for breach of contract and one for trespass, are not the subject of the HPIP Motion.
[19] Adv. Pro. No. 16-01042, ECF No. 9.
[20] Adv. Pro. No. 16-01042, ECF No. 13 and Adv. Pro. No. 16-01043, ECF No. 11.
[21] Adv. Pro. No. 16-01042, ECF No. 15 (the "HPIP Reply"); Adv. Pro. No. 16-01043, ECF No. 13 (the "Nordheim Reply").

2016, the Debtors filed their reply in support of the SJ Motion.[22]

## Legal Standard

Judgment on the pleadings is warranted when the "material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings."[23]  When deciding a motion for judgment on the pleadings, the court considers the pleadings as true and must draw all inferences as to facts in favor of the nonmoving party.[24]  In addition, the court may consider any written documents attached to the pleadings and any matter of which the court can take judicial notice for the factual background of the case.[25]  The court may also consider a document "on which the complaint heavily relies and which is  integral to the complaint."[26]

Similarly, summary judgment "must be granted to the movant 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'"[27]

## Discussion

Given the nature of the Defendant Motions and the SJ Motion, the parties appear to agree that the claims and counterclaims that are the subject of the motions do not give rise to disputed

---

[22] Adv. Pro. No. 16-01042, ECF No. 18 and Adv. Pro. No. 16-01043, ECF No. 15 (the "Debtors' Reply").

[23] *See Prentice v. Apfel*, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

[24] *Viacom Int'l Inc. v. Time Inc.*, 785 F. Supp. 371, 375 (S.D.N.Y. 1992).

[25] *In re Bakery & Confectionery Union & Indus. International Pension Fund Pension Plan*, 865 F. Supp. 2d 469, 472 (S.D.N.Y. 2012) (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011), *aff'd sub nom. Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 751 F.3d 71 (2d Cir. 2014)).

[26] *Id.* (citing *Chamber v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[27] *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting  Fed. R. Civ. P. 56(c)).

questions of material fact and that they can be resolved on the basis of the pleadings.[28]   The

parties disagree, however, as to the proper legal conclusions with respect to those claims.   Based

on the undisputed facts and applicable law, the Court holds (consistent with the Rejection

Decision) that the covenants at issue[29] do not run with the land under Texas law either as real

covenants or as equitable servitudes, and it therefore denies the Defendant Motions and grants

the SJ Motion.

### A.  The Covenants Do Not Run With the Land As Real Covenants

As explained in the Rejection Decision, under Texas law, a covenant runs with the land

when (1) it touches and concerns the land; (2) it relates to a thing in existence or specifically

binds the parties and their assigns; (3) it is intended by the original parties to run with the land;

and (4) the successor to the burden has notice.[30]   The parties disagree as to whether horizontal

privity of estate is also required between the covenanting parties inasmuch as some Texas courts

have not expressly addressed the horizontal privity requirement in determining whether a

covenant runs with the land.   In light of the fact that numerous Texas courts have expressly

included horizontal privity in their analyses,[31] the Court is not persuaded that the requirement of

---

[28] In the Nordheim Reply, Nordheim suggests that discovery would be required if the Court were to find that Sabine has not conveyed any interest to Nordheim in the allegedly burdened real property.  *See* Nordheim Reply, p. 10. The Court declines Nordheim's invitation to delay, once again, a final determination of this matter.  Indeed, Nordheim's filing of the Nordheim Motion impliedly waives any argument as to the necessity of additional discovery on that issue.  Moreover, Nordheim has not identified which facts alleged by the Debtors in the SJ Motion are in dispute and thus warrant denial of the SJ Motion.

[29] As identified in the Rejection Decision, the covenants at issue are (i) the Debtors' dedication to HPIP of certain oil, gas and water products and certain leases to the performance of the HPIP Agreements; (ii) the Debtors' dedication to Nordheim of certain gas and condensate products to the performance of the Nordheim Agreements; and (iii) the Debtors' covenant to pay Nordheim a gathering fee.  Rejection Decision, p. 9.

[30] *Inwood North Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987).

[31] *See, e.g. Wasson Interests, Ltd. v. Adams*, 405 S.W.3d 971, 973 (Tex. App. 2013); *Wayne Harwell Props. v. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex.  App. 1997); *In re Energytec, Inc.,* 739 F.3d 215, 221 (5th Cir. 2013).

horizontal privity has been abandoned under Texas law, and therefore, as it did in the Rejection Decision, the Court shall consider the issue of horizontal privity of estate.

In the Defendant Motions, Nordheim and HPIP largely reassert the arguments raised in their objections to the Debtors' Rejection Motion, but identify additional caselaw which they believe supports their position. The Court incorporates by reference its analysis in the Rejection Decision,[32] and addresses the additional arguments and authorities raised by Nordheim and HPIP in the Defendant Motions below.

### 1. The Covenants Do Not "Touch and Concern" the Debtors' Real Property

In support of their argument that the covenants at issue touch and concern minerals in the ground and thus touch and concern real property, Nordheim and HPIP rely on a theory that they did not present in the context of the Rejection Motion, but which the Court nevertheless expressly rejected in the Rejection Decision.[33] Specifically, they argue that because Texas law deems a conveyance of oil and gas "produced and saved" as the creation of a royalty interest and therefore a real property interest,[34] that means that Sabine's dedication of minerals "produced and saved" is a dedication of minerals in place and, therefore, the dedication touches and

---

[32] *See* supra n. 6.

[33] As the Court explained in the Rejection Decision:

> An argument might be made that the fact that only "produced" Products are dedicated to the performance of the Agreements does not limit such a dedication to Products extracted from the ground (*i.e.*, personal property) but also includes Products that are still in the ground (*i.e.*, real property) because, under Texas law, a conveyance of oil and gas "produced and saved" is classified as a royalty interest, which is characterized by Texas courts as a real property interest. Such an argument, however, depends on the separate and different conclusion that a conveyance of oil and gas "produced and saved" is a conveyance of oil and gas not extracted from the ground, *i.e.*, the reserves. That conclusion does not logically follow, and therefore any such argument would fail. Moreover, as discussed *infra*, the Debtors' reserves are subject to the liens of their reserve-based lenders.

Rejection Decision, p. 15 n. 44.

[34] Under Texas law, a royalty interest is *per se* a mineral interest. *See, e.g., Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986) (listing the five real property rights that comprise a mineral estate, including the right to receive royalty payments).

8

concerns real property.  The characterization under Texas law of a conveyance of oil and gas "produced and saved" as a royalty interest, however, does not lead to the conclusion that the burdening of oil and gas "produced and saved" burdens oil and gas still in the ground.  Nor does that conclusion inexorably follow from the fact that Texas law considers other rights to payment relating to and arising only upon the production of oil and gas as creating interests in minerals still in place.  There is no allegation here that the Debtors owe, to either Nordheim or HPIP, a royalty payment or any other obligation deemed a real property interest under Texas law, and Texas law does not hold that <u>all</u> rights and obligations relating to minerals yet to be produced necessarily create rights and obligations relating to real property.  By the plain terms of the Nordheim Agreements and the HPIP Agreements, the mineral dedications concern only minerals extracted from the ground, which indisputably constitute personal property, not real property, under Texas law.

Moreover, the Texas cases that Nordheim and HPIP cite in support of this argument are either distinguishable or largely inapposite here.  For example, Nordheim suggests that the "precise issue" whether an interest in a "produced" mineral constitutes a real property interest in the minerals in the ground was addressed in *American Refining Co. v. Tidal Western Oil Corp.*,[35] in which the court found that the covenants at issue related to minerals in the ground (and thus real property) based on the court's interpretation of the various contractual undertakings of the parties.[36]  Here, unlike in *American Refining*, the terms of the Nordheim Agreements and the HPIP Agreements do not support an interpretation of those agreements as relating to minerals in the ground, but instead include provisions to the contrary, such as (i) Sabine's reservation of

---

[35] 264 S.W. 336, 336 (Tex. Civ. App. 1924).
[36] *See* Nordheim Motion, pp. 11-12.

rights to operate its oil and gas properties independent of and without interference from its gatherer;[37] (ii) the obligations of Nordheim and HPIP to connect their gathering systems to certain "Receipt Points" (as defined in the Nordheim Agreements) or "Central Delivery Points" (as defined in the HPIP Agreements) and not directly to Sabine's wells;[38] and (iii) that the gathering fee payable to the gatherer is triggered by the gatherer's receipt of gas, not by the extraction of gas from the ground.[39]    Neither Nordheim nor HPIP has carried its burden to demonstrate that the subject of their respective agreements is minerals in the ground rather than minerals extracted from the ground.

Nordheim and HPIP next point to certain provisions of the Debtors' Second Amended and Restated Credit Agreement (the "Credit Agreement") to argue that Sabine could have granted Nordheim and HPIP interests in the Debtors' real property without consent of the Debtors' lienholders.    Nordheim and HPIP argue that, pursuant to § 9.03(b) and articles I(d) and (f) of the Credit Agreement, the interests granted to them by the Debtors meet the definition of "Excepted Liens" and, therefore, the consent of the Debtors' lienholders to a conveyance of an interest in property to Nordheim and HPIP was not required to create a valid interest in the Debtors' real property.

---

[37] *See* Nordheim Gas Gathering Agreement, §1.4(i); Appendix to HPIP Production Gathering, Treating and Processing Agreement §3.B.

[38] Nordheim Gas Gathering Agreement §2.1; HPIP Production Gathering, Treating and Processing Agreement §§3.1.1 and 3.1.2.

[39] Nordheim and HPIP's reliance on *Wimblery v. Lone Star Gas Co.*, 818 S.W.2d 868 (Tex. App. 1991); *Prochemco, Inc. v. Clajon Gas Co.*, 555 S.W.2d 189, 191 (Tex. Civ. App. 1977); and *Montfort v. Trek Resources, Inc.*, 198 S.W.3d 344 (Tex. App. 2006) is also unavailing.  In *Wimberly*, the court, after limited analysis, found that a water company's right to access and extract water directly from a real property owner's wells touched and concerned that real property.  Here, in contrast, Nordheim and HPIP do not have the right to extract minerals from Sabine's real property; rather, they have the right to transport the minerals extracted and delivered by Sabine, which minerals, as discussed above, constitute personal property.  Moreover, neither the *Prochemco* nor *Montfort* decision provides any analysis as to the "touch and concern" prong.  In particular, the court in *Prochemco* addressed only the "intent of the parties" prong.

10

This argument, however, ignores the carveout from the definition of "Excepted Liens" in articles I(d) and (f) of any property interest that "materially impair[s] the use of the Property…or materially impair[s] the value of such Property subject thereto."[40]   Nordheim and HPIP cannot have it both ways: if, as Nordheim and HPIP argue, the covenants at issue satisfy the "touch and concern" requirement by affecting the value and use of the real property, then the real property interests allegedly conveyed through those covenants cannot qualify as "Excepted Liens" under the Credit Agreement.   Therefore, even if the Court were to find that the Debtors conveyed a real property interest to Nordheim or HPIP that satisfied the touch and concern prong – which it does not – those conveyances would have been made in violation of the terms of the Credit Agreement and would constitute a default by the Debtors under the Credit Agreement.[41]

## 2. If Horizontal Privity of Estate Is a Requirement Under Texas Law, It Is Not Satisfied Here

In the Defendant Motions, Nordheim and HPIP cite to a selection of Texas cases[42] in which the court, they argue, does not expressly address horizontal privity of estate and nonetheless holds that the covenants at issue run with the land.   Nordheim and HPIP submit that, under the facts of those cases, horizontal privity of estate does not exist, and, therefore, those cases confirm that horizontal privity is not a requirement under Texas law for a covenant to run with the land.

---

[40] *See* Credit Agreement, arts. I(d) and (f).

[41] Such a violation would constitute an Event of Default under §10.01 of the Credit Agreement, and the Debtors' lenders would be entitled to (i) terminate their obligation to lend to and provide letters of credit on behalf of the Debtors, (ii) declare the Debtors' outstanding debt obligations due and payable, and (iii) exercise all other rights and remedies available to such lenders at law or equity.   Credit Agreement §§10.02(a) and (b).

[42] *See, e.g., Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903 (Tex. 1982); *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632 (Tex. 1987); *Wimberly v. Lone Star Gas Co.*, 818 S.W.2d 868 (Tex. App. 1991).

11

Although the Court acknowledges that there is some ambiguity under Texas law as to whether horizontal privity of estate remains a requirement for a covenant to run with the land, it does not, and cannot, conclude that Texas courts have definitively rejected horizontal privity of estate as a requirement for a covenant to run with the land. Moreover, while the Court does not offer its opinion as to whether horizontal privity of estate existed in the cases Nordheim and HPIP cite, it is far from clear that horizontal privity of estate was lacking in each of those cases.

Moreover, in disputing Nordheim and HPIP's assertion that horizontal privity of estate is no longer a requirement under Texas law, the Debtors cite to a number of recent Texas cases in which the courts expressly considered horizontal privity of estate in their analyses.[43] Indeed, neither Nordheim nor HPIP has identified any authority affirmatively indicating that horizontal privity of estate between the covenanting parties is no longer a requirement for a covenant to run with the land. Therefore, absent any actual authority to the contrary, the Court considers horizontal privity of estate in its analysis under Texas law.

The Court agrees with the Debtors that neither Nordheim nor HPIP has demonstrated that horizontal privity of estate exists between the original covenanting parties with respect to the covenants at issue. In the Nordheim Motion, Nordheim argues that horizontal privity of estate is satisfied by virtue of the creation of the Pipeline Easement and the conveyance of the Nordheim Parcel. As the Court found in the context of the Rejection Decision, these facts do not fit within the traditional paradigm for horizontal privity of estate between covenanting parties, as was the case in the Fifth Circuit's decision in *Newco Energy v. Energytec, Inc.*[44] As the Debtors argue in the SJ Motion, the model for the creation of horizontal privity of estate is the conveyance of an

---

[43] *See* SJ Motion, p. 27, n. 21.
[44] 739 F.3d 215 (5th Cir. 2013).

interest in property that itself is being burdened with the relevant covenant, not the conveyance of an interest in property that is distinct from (even if somewhat related to) the property burdened by the covenant.[45]

Moreover, neither Nordheim nor HPIP has identified any authority for the proposition that the horizontal privity of estate prong is satisfied if the covenanting parties have horizontal privity of estate only with respect to property separate from the property burdened by the covenant at issue.[46]  Instead, Nordheim and HPIP argue, without support, that horizontal privity of estate exists through the conveyance of any land "involved" in the covenants at issue.  Again, this overly broad conception of the horizontal privity of estate requirement is inconsistent with the historical paradigm as well as the very caselaw Nordheim and HPIP cite.  The theory is especially untenable given that the underlying purpose of the horizontal privity of estate requirement, as explained by HPIP in its objection to the Rejection Motion,[47] is to ensure that a covenant that binds successors is formally recorded in connection with the real property that is being burdened by the covenant.

In addition, Nordheim's argument that the Pipeline Easement constitutes an interest in the leasehold, and therefore its creation satisfies horizontal privity of estate, is unavailing.  First, Nordheim suggests that horizontal privity of estate can be satisfied by a contractual provision that contemplates but does not effectuate a future assignment by Sabine of real property interests

---

[45] *See* SJ Motion, pp. 10, 17 (citing *El Paso Nat. Gas Co. v. Amoco Prod. Co.*, Civ. A. No. 12083, 1992 WL 43925 (Del. Ch. Mar. 4, 1992)).

[46] Nordheim's reliance on *Clear Lake Apartments v. Clear Lake Util. Co.*, 537 S.W.2d 48 (Tex. App. 1976), *aff'd as modified*, 549 S.W.2d 385 (Tex. 1977), and its insistence that *Ball v. Rio Grande Canal Co.*, 256 S.W. 678 (Tex. Civ. App. 1923), *writ refused* (Jan. 23, 1924), is "indistinguishable from this case" are largely mistaken.  Both cases are consistent with the view that horizontal privity of estate is satisfied only when a property interest in the land burdened by the covenant at issue has been conveyed.

[47] Case No. 15-11835, ECF No. 386, pp. 14-15.

to Nordheim.  This argument defies common sense – the possibility of horizontal privity of estate does not constitute actual horizontal privity of estate.  Second, Nordheim argues that horizontal privity of estate is satisfied because Nordheim has a real property interest in the form of the right to take minerals out of Sabine's mineral estate.    This argument is premised on a mischaracterization of the Nordheim Agreements (and, as applicable, the HPIP Agreements).  As Nordheim acknowledges, under those agreements, Sabine is responsible for connecting its wells to Receipt Points (as defined in the Nordheim Agreements).[48]   Nordheim and HPIP are responsible for constructing a gathering system that is also to be connected to the Receipt Points (or, in the case of HPIP, the "Central Delivery Points").  Under this framework, therefore, none of Nordheim or HPIP's structures connects to Sabine's wells themselves, and neither Nordheim nor HPIP has the right to connect its pipelines to the Debtors' wells.  Consequently, the cases on which Nordheim relies that hold that a party's right to "go upon the land and place there the necessary structures to connect the wells" to such party's pipeline are inapplicable to the present facts.[49]  Nordheim's arguments assume rather than demonstrate the existence of a real property interest in Sabine's mineral estate.[50]

In addition to joining Nordheim's arguments, HPIP advances additional arguments in the HPIP Reply that Sabine did in fact convey to HPIP an interest in the allegedly burdened real property.  These arguments also fail.  First, HPIP argues that any "dedication" of real property is by definition a conveyance of that real property.  This circular argument ignores the fact that,

---

[48] Under the HPIP Agreements, Sabine is responsible for connecting its wells to "Central Delivery Points."
[49] *See Guffey v. Utex Exploration Co.*, 376 S.W.2d 1, 5 (Tex. Civ. App. 1964), *writ refused NRE* (May 13, 1964); *Southwest Pipe Line Co. v. Empire Natural Gas Co.*, 33 F.2d 248, 252 (8th Cir. 1929).
[50] Nordheim also argues in the Nordheim Reply that it holds a "profit à prendre", which runs with the land.  Nordheim Reply, pp. 11-12.  The Court will not consider this new argument raised at the reply stage for the first time.  In any event, the argument does not change the Court's conclusion.

under Texas law, a conveyance of real property requires a grant of an interest in such real property, which requires certain operative language, including an identification of a grantee.[51] Here, not only do the HPIP Agreements contain no language evidencing a conveyance of real property, but, as discussed below, they contain language expressly disclaiming any such conveyance.[52]

Undaunted, HPIP disputes the Debtors' characterization of the express terms of the HPIP Agreements as disclaiming any conveyance of an interest in Sabine's real property. HPIP argues instead that the language in the HPIP Agreements that Sabine does not "sell, transfer or assign"[53] to HPIP any interest in the Debtors' real property "does not disclaim the transfer of interest in the Leases…it merely states that no broader conveyance of title to the leases, or to the other personal property of Sabine, was to be inferred from the Agreements overall."[54] HPIP's tortured reading of the HPIP Agreements is not persuasive. The inclusion of this language in the HPIP Agreements lends further support to the conclusion that Sabine did not grant HPIP any interest in Sabine's mineral estate or in other real property pursuant to the HPIP Agreements.

Accordingly, without concluding whether or not horizontal privity of estate is indeed a requirement under Texas law, the Court finds that horizontal privity does not exist between Sabine and Nordheim or between Sabine and HPIP.

### B.  The Covenants Do Not Run With the Land As Equitable Servitudes

---

[51] *See, e.g. Masgas v. Anderson*, 310 S.W.3d 567, 571 (Tex. App. 2010).

[52] The Court also notes that Sabine's contractual dedications in the HPIP Agreements are to the "performance of the [agreements]," not to an identified grantee. HPIP Water and Acid Handling Agreement §1.2; HPIP Production Gathering, Treating and Processing Agreement §1.2.

[53] HPIP Water and Acid Handling Agreement §8.3; HPIP Production Gathering, Treating and Processing Agreement §9.3. Similarly, the Nordheim Agreements provide that title to Sabine's oil and gas remain with Sabine. *See, e.g.* Nordheim Gathering Agreement §3.7.

[54] HPIP Reply, p. 7.

15

An equitable servitude is enforceable when the contracting parties are in privity of estate at the time of the conveyance and a subsequent party purchases the land with notice of the restriction.[55]   In addition, the restriction sought to be enforced must limit the use of the purportedly burdened land and benefit the land of the party seeking to enforce it.[56]

As it held in the Rejection Decision, and based on its additional "touch and concern" analysis above, the Court holds that the covenants at issue do not limit the use of or burden Sabine's mineral estate such that they could run with that real property as equitable servitudes. The Nordheim Agreements and the HPIP Agreements are fundamentally service contracts relating to personal property of Sabine.   The covenants at issue, therefore, do not constitute equitable servitudes that run with Sabine's real property.

<u>Conclusion</u>

For all of the foregoing reasons and for the reasons stated in the Rejection Decision, the Court finds that the covenants at issue in the Nordheim Agreements and the HPIP Agreements do not run with the land either as real covenants or as equitable servitudes.  Accordingly, (i) the Debtors' motion for summary judgment on their declaratory judgment claims against Nordheim and HPIP is GRANTED; (ii) the Debtors' motion for summary judgment on Nordheim's declaratory judgment counterclaims and HPIP's declaratory judgment counterclaims is GRANTED; and (iii) Nordheim's motion for judgment on the pleadings and HPIP's motion for judgment on the pleadings are DENIED.  The parties are directed to submit an order reflecting the Court's rulings in the Rejection Decision and herein.

---

[55] *El Paso Refinery, LP v. TRMI Holdings, Inc. (In re El Paso Refinery, LP)*, 302 F.3d 343, 358 (5th Cir. 2002).
[56] *Reagan Nat'l Advert. of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 495 (Tex. App. 2002).

Dated:  May 3, 2016
       New York, New York

                           /S/ Shelley C. Chapman
                    HONORABLE SHELLEY C. CHAPMAN
                    UNITED STATES BANKRUPTCY JUDGE

**APPENDIX A**

<u>FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | ) | Case No. 15-11835 (SCC) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

## BENCH DECISION ON DEBTORS' OMNIBUS MOTION
## TO AUTHORIZE REJECTION OF CERTAIN EXECUTORY CONTRACTS[2]

APPEARANCES:

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, NY 10022
By:    Paul M. Basta, P.C.
       Jonathan S. Henes, P.C.
       Christopher Marcus, P.C.


300 North LaSalle
Chicago, IL 60654
By:    James H.M. Sprayregen, P.C.
       Ryan Blaine Bennett, Esq. (argued)
       Brad Weiland, Esq.
*Counsel to the Debtors*

BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Floor
New York, NY 10020

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is: 1415 Louisiana St., Suite 1600, Houston, Texas 77002.

[2]    This decision was dictated on the record of the hearing held on March 8, 2016.  It has been modified to include full citations and defined terms, and reflects minor additional non-substantive modifications.

By:      Robert G. Burns, Esq. (argued)

711 Louisiana St., Suite 2300
Houston, TX 77002
By:      William A. (Trey) Wood III, Esq.
         Jason G. Cohen, Esq.
*Counsel to Nordheim Eagle Ford Gathering, LLC*

LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
By:     Keith Simon, Esq. (argued)
        Annemarie V. Reilly, Esq.
*Counsel to HPIP Gonzales Holdings, LLC*

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
By:     Mark R. Somerstein, Esq. (argued)
        Keith H. Wofford, Esq.
        D. Ross Martin, Esq.
        C. Thomas Brown, Esq.
*Counsel to the Official Committee of Unsecured Creditors*

LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
By:     Margot B. Schonholtz, Esq. (argued)
        Robert H. Trust, Esq.
*Counsel to Wells Fargo, National Associate,*
*as Administrative Agent under First Lien Credit Agreement*

HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Before the Court is the Debtors' Motion (the "Motion") for an Order Authorizing

Rejection of Certain Executory Contracts [ECF No. 371].  By the Motion, the Debtors seek to

reject certain contracts between Sabine Oil & Gas Corporation ("Sabine") and Nordheim Eagle

Ford Gathering, LLC ("Nordheim"), and between Sabine and HPIP Gonzales Holdings, LLC

("HPIP") pursuant to section 365(a) of the Bankruptcy Code.

On October 8, 2015, Nordheim and HPIP[3] each filed an objection to the Motion [ECF

Nos. 386 and 387].  On October 14, 2015, the Debtors filed their omnibus reply to the objections

[ECF No. 410].  On January 8, 2016, Nordheim filed a surreply to the Motion [ECF No. 676],

and on January 22, 2016, the Debtors filed a response to that surreply [ECF No. 742].  The Court

heard oral argument on the Motion on February 2, 2016.

**Background**

The Debtors — an independent energy company engaged in the acquisition, production,

exploration, and development of onshore oil and natural gas properties in the United States —

filed petitions for relief under chapter 11 of the Bankruptcy Code with this Court on July 15,

2015.  The Debtors are operating their businesses and managing their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court entered an

order authorizing the joint administration and procedural consolidation of the Debtors' chapter

11 cases pursuant to Bankruptcy Rule 1015(b) on July 16, 2015.  There has not been a request

---

[3]      Nordheim and HPIP are so-called "midstream gatherers."  Situated operationally between
upstream companies such as Sabine and downstream refining companies, midstream gatherers
gather, treat, transport, and/or process mineral products produced from a well before such
products enter the commercial market.  *See, generally*, Kurt L. Krieger*, Gathering and
Transporting Marcellus and Utica Shale Natural Gas to the Market and the Regulation of
Midstream Pipeline Companies*, 19 Tex. Wesleyan L. Rev. 49 (2012).

1

for the appointment of a trustee or examiner in these chapter 11 cases.  On July 28, 2015, the

Office of the U.S. Trustee for the Southern District of New York formed the official committee

of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.  Familiarity with the

background of the Debtors' businesses and chapter 11 cases, and with the December 16, 2014

combination of Sabine Oil & Gas LLC and Forest Oil Corporation (the "Combination"), is

assumed.[4]

### A.  The Nordheim Agreements

As a result of the Combination, Sabine became party to two contracts with Nordheim,

each dated January 23, 2014: the first, a Gas Gathering Agreement, and the second, a Condensate

Gathering Agreement (together, the "Nordheim Agreements").  By the Gas Gathering

Agreement, Sabine agreed to "dedicate" to the "performance" of that agreement all of the gas

produced by Sabine from a designated area and deliver such gas to Nordheim, and Nordheim

agreed to gather, treat, dehydrate, and re-deliver that gas to Sabine.  Nordheim further agreed to

construct, at its sole cost and expense, a gathering system of pipelines and treatment facilities to

provide certain agreed-upon services.  The Gas Gathering Agreement contemplates a separate

and subsequent conveyance from Sabine to Nordheim of a mutually agreed tract of land in

connection with Nordheim's construction and operation of the gathering system.  Sabine also

agreed to deliver a certain minimum amount of gas to Nordheim on an annual basis.  To the

extent it does not deliver such minimum amounts, Sabine is required to make a deficiency

payment to Nordheim; Sabine also is obligated to pay monthly gathering fees to Nordheim.  The

Gas Gathering Agreement has a 10-year term, with automatic yearly renewal subject to

termination, and is governed by Texas law.

---

[4]     *See, generally, Declaration of Michael Magilton (A) in Support of First Day Motions and (B)
        Pursuant to Local Bankruptcy Rule 1007-2 [ECF No. 3].*

The Condensate Gathering Agreement between Sabine and Nordheim contains substantially the same terms as the Gas Gathering Agreement, but it relates to liquid hydrocarbons and other liquids rather than gas.  The Court will refer to the liquid hydrocarbons, gas, and other products that are the subject of the dedications in the Nordheim Agreements as the "Nordheim Products."

Each Nordheim Agreement specifically provides that the agreement itself is a "covenant running with the [land]" within the designated area, and is enforceable by Nordheim against Sabine, its affiliates, and their successors and assigns.[5]

## B.  The HPIP Agreements

Sabine also became party to two contracts with HPIP as a result of the Combination: one, a Production Gathering, Treating and Processing Agreement, dated May 3, 2013, and the other a Water and Acid Gas Handling Agreement, dated May 2014, with no specific date (together, the "HPIP Agreements").  The former, the HPIP Gathering Agreement, obligates Sabine to "dedicate" to the "performance" of the agreement certain leases owned by Sabine and the oil, gas, and water produced from the wells located on the land subject to those leases, and to deliver that oil, gas, and water to HPIP.  Pursuant to the agreement, HPIP agreed to construct, operate, and maintain gathering facilities to provide certain services with respect to the products delivered by Sabine.  The HPIP Gathering Agreement is also governed by Texas law.

The latter, the HPIP Handling Agreement, contains substantially similar terms to those set forth in the HPIP Gathering Agreement, but provides for HPIP to construct, operate, and maintain disposal facilities for and perform disposal services with respect to all of the water and acid gas produced by Sabine from the same land subject to the leases.  The Court will refer to the

---

[5]    Nordheim Gas Gathering Agreement ¶ 1.6; Nordheim Condensate Gathering Agreement ¶ 1.6.

oil, gas, acid, and water that are the subject of the dedications in the HPIP Agreements as the
"HPIP Products."

Each HPIP Agreement provides that Sabine's undertaking to deliver the HPIP Products to
HPIP is a covenant "running with the lands and leasehold interests" identified in the agreement,[6]
and further provides that the agreement "shall be binding upon and inure to the benefit of the
Parties hereto, their successors, assigns, heirs, administrators and/or executors."[7]

## <u>Discussion</u>

### A.  The Debtors Have Satisfied the Standard for Rejection of the Agreements

The Debtors seek to reject the Nordheim Agreements and the HPIP Agreements (referred
to collectively as the "Agreements") pursuant to section 365(a) of the Bankruptcy Code.  Under
that provision, a debtor in possession, "subject to the court's approval, may assume or reject any
executory contract…of the debtor."[8]  Subject to the requirement of notice and a hearing, and the
bankruptcy court's approval, section 365(a) allows the debtor in possession to evaluate its
executory contracts (and unexpired leases) and "decide which ones would be beneficial to adhere
to and which ones it would be beneficial to reject."[9]  "The purpose behind allowing the
assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to
use valuable property of the estate and to renounce title to and abandon burdensome property."[10]

As the Second Circuit held in *Orion Pictures Corp. v. Showtime Networks*, the "process
of deciding a motion to assume [or reject] is one of the bankruptcy court placing itself in the
position of…the debtor in possession and determining whether assuming [or rejecting] the

---

[6]    HPIP Gathering Agreement ¶ 1.2; HPIP Handling Agreement ¶ 1.2.

[7]    HPIP Gathering Agreement ¶ 9.2.1; HPIP Handling Agreement ¶ 8.2.1.

[8]    11 U.S.C. § 365(a).

[9]    *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F. 3d 1095, 1098 (2d
Cir. 1993).

[10]    *Id.*

contract would be a good business decision or a bad one."[11]  This analysis is generally referred to

as a "business judgment" test, although it varies somewhat from the traditional business

judgment rule employed in state corporate law,[12] and requires the court to look at whether the

debtor's decision to assume or reject is beneficial to the estate.[13]  The bankruptcy court generally

defers to a debtor's determination as to whether rejection of an executory contract is

advantageous,[14] unless the decision to reject is the product of bad faith, whim, or caprice.[15]

Unless a separate provision of the Bankruptcy Code provides a non-debtor party with specific

protection, the interests of the debtor and its estate are paramount; adverse effects on the non-

debtor contract party arising from the decision to assume or reject are irrelevant.[16]  At root, the

question for the court on a motion to reject is "whether a reasonable business person would make

a similar decision under similar circumstances."[17]

The Debtors argue that rejection of the Nordheim Agreements and the HPIP Agreements

is a reasonable exercise of their business judgment and is in the best interests of their estates

because those Agreements are unnecessarily burdensome.  Specifically, the Debtors submit that

it is not financially viable for them to deliver the minimum amounts of gas and condensate set

forth in the Agreements, and, absent rejection, they would therefore be required to make the

contractual deficiency payments, which would impose a considerable and unnecessary drain on

---

[11]    *Id.* at 1099; *see also In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008); *In re The Great Atlantic & Pacific Tea Co.*, 544 B.R. 43 (Bankr. S.D.N.Y. 2016) (RDD).

[12]    *In re The Great Atlantic & Pacific Tea Co.*, 544 B.R. at 48.

[13]    *In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 898033, at *4 (Bankr. S.D.N.Y. Mar. 24, 2006).

[14]    *In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005).

[15]    *Westbury Real Estate Ventures v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996).

[16]    *In re Penn Traffic Co.*, 524 F.3d at 383; *In re The Great Atlantic & Pacific Tea Co.*, 472 B.R. at 672-73; *In re Old Carco LLC*, 406 B.R. 180, 192-93 (Bankr. S.D.N.Y. 2009).

[17]    *In re Helm*, 335 B.R. 528, 538-39 (Bankr. S.D.N.Y. 2006).

the estates' resources.  If rejection is authorized, the Debtors state that they plan to enter into new gathering agreements with other gatherers on terms more favorable to the Debtors.

Both Nordheim and HPIP object to the Debtors' proposed rejection, but for slightly different reasons.  In its papers, Nordheim argues that the Debtors' decision to reject the Nordheim Agreements does not satisfy the business judgment standard because Sabine's covenants to dedicate the Nordheim Products and to pay a "transportation fee" are covenants that run with the land and therefore would survive rejection.[18]  As argued by Nordheim, if the Debtors reject the Nordheim Agreements, Sabine would remain bound by those covenants, and rejection of the remainder of the agreements would provide little or no benefit to the Debtors' estates.

At oral argument, however, Nordheim put forward an additional and distinct argument for the first time: that while the Court can authorize the Debtors' rejection of the Nordheim Agreements, it cannot in doing so make a determination as to the legal status under Texas property law of those covenants in the Nordheim Agreements that Nordheim argues "run with the land."  In support of its argument, Nordheim relies on the Second Circuit's decision in *Orion* as a legal limitation on the Court's authority in the context of the Motion.  In that case, the Second Circuit found that a bankruptcy court had committed reversible error by deciding a disputed factual issue in the context of a motion to assume an executory contract.

Like Nordheim, HPIP argues that Sabine's dedication of certain of its leases and the HPIP Products are covenants that run with the land and are not subject to rejection.[19]  Unlike

---

[18]    Nordheim Objection, ¶ 16 (citing *In re Banning Lewis Ranch Co., LLC*, 532 B.R. 335, 346 (Bankr. D. Colo. 2015) for proposition that debtor's rejection of an agreement does not affect covenants to non-debtor parties that run with the land).

[19]    HPIP Objection, ¶ 9 (citing *Gouveia v. Tazbir*, 37 F.3d 295, 298 (7th Cir. 1994) holding that covenants running with the land are property interests and cannot be extinguished through bankruptcy).

Nordheim, however, HPIP does not object to the rejection of the HPIP Agreements, but opposes

only the Debtors' attempt to reject those certain covenants contained in the HPIP Agreements

that HPIP argues "run with the land."[20]  Contrary to Nordheim's *Orion* argument, HPIP submits

that the Court should make an affirmative determination in the context of this Motion that the

covenants do in fact run with the land and therefore cannot be rejected.

Significantly, neither Nordheim nor HPIP has put forward any arguments or evidence

that the Debtors' decision to reject their Agreements is the product of "bad faith, whim or

caprice."

As discussed more fully below, after review of Nordheim's *Orion* argument and Judge

Drain's recent decision in *In re The Great Atlantic & Pacific Tea Company, Inc.* interpreting

*Orion*, the Court concludes that it cannot decide substantive legal issues, including whether the

covenants at issue run with the land, in the context of a motion to reject, unless such motion is

scheduled simultaneously with an adversary proceeding or contested matter to determine the

merits of the substantive legal disputes related to the motion.[21]  Although Federal Rules of

Bankruptcy Procedure 6006 and 9014 provide that a proceeding to reject an executory contract is

a contested matter, the Second Circuit's decision in *Orion* makes clear that such a proceeding

"should be considered a summary proceeding, intended to efficiently review the trustee's or

debtor's decision to adhere to or reject a particular contract in the course of the swift

administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a

lengthy trial with disputed issues."[22]  In the instant case, because there is not procedural clarity or

consensus as to whether issue was properly joined on the substantive legal issues presented by

the Motion – *i.e.*, whether certain of the contractual terms are covenants that "run with the land"

---

[20]     HPIP Objection, p. 2.
[21]     *Orion*, 4 F.3d. at 1099.
[22]     *Id.* at 1098-99.

7

under Texas law – the Court must proceed in accordance with *Orion* and rule on the Motion

without deciding in a binding way the underlying legal dispute with respect to whether the

covenants at issue run with the land.  The Court does so reluctantly inasmuch as there is no doubt

that bifurcating the motion to reject and further proceedings to finally resolve the underlying

property law dispute is an inefficient use of judicial and private resources; it would have been far

preferable for the Court to hear the two together.

At oral argument, counsel for HPIP acknowledged that HPIP does not object to the

Debtors' rejection of the HPIP Agreements, stating that "there's no question they should reject"[23]

and that "assumption wouldn't make any sense."[24]  Accordingly, there is no dispute with respect

to the reasonableness of the Debtors' decision to reject the HPIP Agreements.  Nordheim,

however, challenges the reasonableness of the Debtors' decision to reject the Nordheim

Agreements, but has put forward no evidence or argument that the Debtors' decision was the

product of bad faith, whim, or caprice, or was otherwise an unreasonable exercise of the Debtors'

business judgment.

If it is ultimately determined that the covenants at issue in the Agreements do not run

with the land, as the Debtors argue and the Court believes to be the case, the Debtors will be free

to negotiate new gas gathering agreements with any party, likely obtaining better terms than the

existing agreements provide.  If, however, the covenants are ultimately determined to run with

the land, the Debtors will likely need to pursue alternative arrangements with Nordheim and

HPIP consistent with the covenants by which the Debtors would remain bound.  In either

scenario, the Debtors' conclusion that they are better off rejecting the Nordheim and HPIP

Agreements is a reasonable exercise of their business judgment.  Therefore, even though, as

---

[23]    Tr. of 2/2/16 Hearing 94:16-17 [ECF No. 816].
[24]    Tr. of 2/2/16 Hearing 97:20-23.

explained below, the Court's conclusion that the covenants at issue do not run with the land is non-binding, the Court finds the Debtors' decision to reject each of the Nordheim Agreements and the HPIP Agreements to be a reasonable exercise of business judgment.

In the absence of any allegation challenging the Debtors' decision-making process, the Court finds that the Debtors have properly and adequately considered the business and legal risks associated with rejection of the Nordheim Agreements and the HPIP Agreements.  Taking into account HPIP's consent to the rejection of the HPIP Agreements, and having identified no basis to find otherwise with respect to either the Nordheim Agreements or the HPIP Agreements, the Court defers to the business judgment of the Debtors to reject the Agreements.  Rejection of the Agreements relieves the Debtors of those terms that are subject to rejection (whether that be all or some of the terms of the Agreements as will be decided in a subsequent proceeding or agreed to by the parties), and will likely allow for the more efficient use of the Debtors' assets.

The Court's non-binding analysis as to whether the covenants at issue "run with the land" under Texas law follows.[25]

## B.  The Covenants At Issue Do Not "Run with the Land" under Texas Law

The covenants at issue are (i) the Debtors' dedication to HPIP of the HPIP Products and certain leases to the performance of the HPIP Agreements; (ii) the Debtors' dedication to Nordheim of the Nordheim Products to the performance of the Nordheim Agreements; and (iii) the Debtors' covenant to pay Nordheim a gathering fee.  Generally, a covenant may run with the land as a real covenant or as an equitable servitude.  Here, the Court preliminarily finds that none of the covenants runs with the land either as a real covenant or as an equitable servitude.

---

[25]    It is clear that under *Orion* the Court may consider disputed legal issues in a non-binding way in the context of a motion to reject.  *In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. at 52.

1.    **Historical Development of Covenants "Running with the Land"**[26]

As many practitioners have noted, "[i]n U.S. property law, no rules are more arcane and

anachronistic than those governing real covenants,"[27] a statement with which every first-year law

student undoubtedly agrees.  Nevertheless, the use of property covenants is pervasive in the

United States, and the law relating to covenants, while archaic, must still be faithfully applied.

To inform its analysis of Texas law and its application to the facts here, the Court provides some

background on the origins and development of covenants "running with the land" in the United

States.

The original concept of covenants "running with the land" was introduced in early

English law at a time when neither the rights nor the duties created by contract could be

assigned.  Beginning in the landlord and tenant context, the idea that the benefit and burden of a

covenant could run with the ownership interest was applied in other situations, including

covenants included in a conveyance of land.  These covenants respecting the use of land that ran

with the estate came to be known as "real covenants" and were enforceable in the English courts

of law.

In the early cases, the courts tended to restrict the expansion of the use of real covenants

by adding requirements to be met in order for a successor to recover for breach of a covenant in

the original contract.  For example, in one of the earliest cases dealing with the running of a

burden, *Spencer's Case*,[28] the English court in the year 1583 created two requirements: (1) for a

covenant relating to something not in existence to run, it must expressly bind assigns and (2) a

covenant must "touch and concern" the land in order for it to run.

---

[26]    *See generally* 9 Richard R. Powell, *Powell on Real Property*, § 60.01 (2015).
[27]    53 Rocky Mt. Min. L. Inst. § 19.01 (2007).
[28]    77 E.R. 72 (1583).

By 1834, the English courts of law had greatly narrowed the scope of legal relief available for breaches of covenants by holding that the running of the burdens on owners in fee violated public policy against encumbering land and restricting alienation. Thereafter, English courts of equity began developing rules for the enforcement of covenants against successive interestholders. Although over time English courts stopped finding that affirmative covenants run with the land, American jurisdictions have generally rejected that approach, instead adopting a policy that the requirements for running with the land should be more strictly applied to affirmative covenants than to negative ones. The covenants that meet the test established by the courts of equity have come to be known as "equitable servitudes."

Over time, the use of covenants, both real and equitable, has become common. Yet, many characterize the law of covenants as an "unspeakable quagmire,"[29] in part because of the continued distinction between real covenants and equitable servitudes even after the union of law and equity, as well as the development in judicial decisions of additional requirements and wrinkles across different jurisdictions. Although the American Law Institute has pursued clarification by adopting the *Restatement (Third) of Property: Servitudes* in 1998, acceptance of some of the newer propositions has not been universal.

It is in this historical context that the Court has considered the arguments as to the status under Texas property law of the covenants at issue in this case, and has preliminarily concluded that the covenants do not run with the land either as real covenants or as equitable servitudes.

### 2. Real Covenants

---

[29]    *See* 9 Richard R. Powell, *Powell on Real Property*, § 60.01 (2015) (citing Edward Rabin, Roberta Kwall, Jeffrey Kwall, and Craig Arnold, *Fundamentals of Modern Real Property Law 489* (6th ed. 2011).

The parties agree that whether the covenants run with the land is a question of Texas law, which is the law governing the Agreements. Unfortunately, there appears to be no applicable binding decision of the Texas Supreme Court on all aspects of the question. What follows is the Court's analysis of the issue based on existing caselaw.

Under Texas law, language in a contract containing a covenant is the primary evidence of the parties' intent, but terminology is not dispositive.[30] Rather, a covenant runs with the land when (1) it touches and concerns the land; (2) it relates to a thing in existence or specifically binds the parties and their assigns; (3) it is intended by the original parties to run with the land; and (4) the successor to the burden has notice.[31] Many courts have also required that the parties have horizontal privity of estate. Neither Nordheim nor HPIP has identified any governing authority that has rejected the horizontal privity requirement, and so the Court has considered the issue of horizontal privity of estate in its analysis.[32]

In their omnibus reply to the objections, the Debtors dispute the existence of three of these elements: (1) that there is horizontal privity of estate between, respectively, Sabine and Nordheim, and Sabine and HPIP; (2) that the relevant covenants "touch and concern" the land; and (3) that the parties intended those covenants to run with the land.

Horizontal privity of estate generally means that there was "simultaneous existing interests or mutual privity" between the original covenanting parties as either landlord and tenant or grantor and grantee.[33] According to the traditional concept, the original covenanting parties seeking to create a covenant "running with the land" would need to have some additional transactional element to their relationship, and not merely be two parties seeking to covenant

---

[30]    *Musgrave v. Brookhaven Lake Property Owners Ass'n*, 990 S.W.2d 386, 395 (Tex. App. 1999).
[31]    *Inwood North Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987).
[32]    *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 910-11 (Tex. 1982).
[33]    *Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 222 (5th Cir. 2013).

with one another.[34]  The traditional paradigm involves a property owner reserving by covenant,

either for itself or another beneficiary, a certain interest out of the conveyance of the property

burdened by the covenant.  That was the factual context before the Fifth Circuit in its decision in

*Newco Energy v. Energytec, Inc.*[35] on which both Nordheim and HPIP rely almost exclusively in

support of their argument that the covenants at issue run with the land.  In *Energytec*, the owner

of a pipeline system assigned its property rights to one party, while reserving by covenant for

another party the right to receive a fee for product transported on that property (*i.e.*, through the

pipeline) and a right to consent to any assignment of that property – a clear instance of the

promisor seeking to ensure that the conveyance of its property interests did not eradicate an

interest in the property of a third party.

    The facts here do not fit within that traditional model.  In this case, the Debtors did not in

the context of a relevant conveyance reserve any interest for Nordheim or HPIP; rather, they

simply engaged Nordheim and HPIP to perform certain services related to the hydrocarbon

products produced by Sabine from its property.  The covenants at issue are properly viewed as

identifying and delineating the contractual rights and obligations with respect to the services to

be provided, and not as reserving an interest in the subject real property.

    Moreover, the Agreements do not grant Nordheim or HPIP a real property interest in the

Debtors' mineral estate, which is comprised of five real property rights, or "sticks," under Texas

law: "(1) the right to develop (the right  of  ingress and egress),  (2) the right to lease (the

executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals,

[and] (5) the right to receive royalty payments."[36]  A right to transport or gather produced gas is

---

[34]    53 Rocky Mt. Min. L. Inst. § 19.03 (2007).
[35]    739 F.3d at 221.
[36]    *Lesley v. Veterans Land Bd.*, 352 S.W.3d 479, 481 n.1 (Tex. 2011) (quoting *Altman v. Blake*, 712
        S.W.2d 117, 118 (Tex. 1986)).

clearly not one of these "sticks."[37]  Therefore, under Texas law, the Debtors have not transferred

any portion of their real property interests to Nordheim or HPIP through the Agreements.

The covenants at issue also do not appear to satisfy the "touch and concern" prong.

Courts utilize two tests for determining whether that prong is satisfied under Texas law, although

these tests are not "absolute."[38]  The first test considers whether the covenant "affected the

nature, quality or value of the thing demised, independently of collateral circumstances, or if it

affected the mode of enjoying it."[39]  The second test evaluates whether "the promisor's legal

relations in respect of the land in question are lessened—his legal interest as owner rendered less

valuable by the promise…[and] if the promisee's legal relations in respect to the land are

increased—his legal interest as owner rendered more valuable by the promise."[40]  The Fifth

Circuit, in interpreting Texas law, has stated that "[a]lthough the caselaw is somewhat unclear, it

is at least arguable that the benefit requirement has been abandoned by the Texas courts"—

meaning that a covenant need only burden the promisor's legal interest in the land to "touch and

concern" that land.[41]  But, the Fifth Circuit has also explained that it is not enough that a

covenant affect the value of the land; "it must still affect the owner's interest in the property or its

use in order to be a real covenant."[42]  The covenants at issue here do not satisfy either test: they

do not impact the value of the land "independent of collateral circumstances" and do not affect

any interest in the real property of, or its use by, the owner.  Rather, those covenants constitute

---

[37]    *Id.* at 481.

[38]    *Westland Oil,* 637 S.W.2d at 911.

[39]    *El Paso Refinery, LP v. TRMI Holdings, Inc. (In re El Paso Refinery, LP)*, 302 F.3d 343, 356 (5th Cir. 2002).

[40]    *Westland Oil,* 637 S.W.2d at 911.

[41]    *El Paso*, 302 F.3d at 356.  Not only is the caselaw "somewhat unclear," but each of the two tests identified in the caselaw is somewhat analytically circular.

[42]    *Id.* at 357.

an undertaking personal to the producer (Sabine) and the midstream service providers (Nordheim and HPIP).

Under Texas law, once minerals are extracted from the ground, such minerals cease to be real property and instead become personal property.[43]  The covenants at issue concern only Sabine's interests in the produced "Products."  The dedication covenants provide Nordheim and HPIP, as Sabine's service-providers, with the products needed to perform the contracted-for services.  This is true even for the Debtors' dedication of certain leases in the HPIP Agreements inasmuch as that dedication is in furtherance of the overarching purpose of the contract, which is to provide product services to the Debtors.  Similarly, the gathering fee compensates Nordheim for gathering those Products as part of its provision of those services.  Contrary to HPIP's argument, the "dedication" does not constitute a burdening of the Debtors' property interests, but rather an identification of what property and products are the subject of the Agreement and will be made available to the gatherer in furtherance of the purposes of the Agreements.  Under Texas law, such covenants do not have a direct impact upon the real property from which those products were produced and thus do not "touch and concern" the land.  They concern only the Products produced from real property and affect only Sabine's personal property rights.[44]

---

[43]     *See, e.g., Sabine Prod. Co. v. Frost Nat. Bank of San Antonio*, 596 S.W.2d 271, 276 (Tex. Civ. App. 1980); *Colorado Interstate Gas Co. v. Hunt Energy Corp.*, 47 S.W.3d 1, 10 (Tex. App. 2000), *pet. denied*; *Riley v. Riley*, 972 S.W.2d 149, 155 (Tex. App. 1998); *Phillips Petroleum Co. v. Adams*, 513 F.3d 355, 363 (5th Cir. 1975).

[44]     An argument might be made that the fact that only "produced" Products are dedicated to the performance of the Agreements does not limit such a dedication to Products extracted from the ground (*i.e.*, personal property) but also includes Products that are still in the ground (*i.e.*, real property) because, under Texas law, a conveyance of oil and gas "produced and saved" is classified as a royalty interest, which is characterized by Texas courts as a real property interest. Such an argument, however, depends on the separate and different conclusion that a conveyance of oil and gas "produced and saved" is a conveyance of oil and gas not extracted from the ground, *i.e.*, the reserves.  That conclusion does not logically follow, and therefore any such argument would fail.  Moreover, as discussed *infra*, the Debtors' reserves are subject to the liens of their reserve-based lenders.

15

Another consideration that the Fifth Circuit has examined in determining whether a covenant burdens the land is whether the action triggering the covenant is one that affects the land.[45]  In *Westland Oil*, for example, the Texas Supreme Court held that a covenant obligating a third-party to assign part of its interest in certain oil and gas leases "touched and concerned the land" in part because the covenant was triggered by the drilling of a test well on the land.[46]  Here, the triggers for the covenants at issue relate to the Products, not to the land itself.

The dedication covenants are triggered contractually by Sabine's production and saving of the Nordheim and HPIP Products, while the Nordheim gathering fee covenant is triggered by Nordheim's receipt of the Nordheim Products.  None of those triggers affects the land from which those products have been produced.  Rather, only *the products themselves*, and, importantly, Sabine's rights with respect to those products, are affected by those covenants.[47]  The land itself remains unburdened.[48]

On this basis, once again, *Energytec* is distinguishable.[49]  First, the right to consent to an assignment in *Energytec* was a clear burden on the land because it restricted the landowner's rights of alienation of its property.  Such a burden does not exist here.  Second, unlike the Nordheim gathering fee, the transportation fee in *Energytec* was secured by a lien on the entire

---

[45]    *El Paso*, 302 F.3d at 356 (distinguishing *Westland Oil*).

[46]    *Westland Oil*, 302 F.3d at 357.

[47]    A question as to the extent of the Debtors' rights under the Agreements or otherwise to transport Products by means other than the gathering systems of Nordheim and HPIP arose at oral argument – to wit, the Debtors acknowledged that they are in fact using trucks instead of the HPIP gathering system to transport certain HPIP Products, a fact of which HPIP's counsel stated he was unaware.  *See* Tr. of 2/2/16 Hearing 105:18-23.  The transportation of the HPIP Products other than through HPIP's gathering system, if permissible under the HPIP Agreements, supports the conclusion that the dedication covenants in the HPIP Agreements do not "touch and concern" the land.  As of the date hereof, HPIP has not, to the Court's knowledge, sought injunctive relief against the Debtors relating to such activities.

[48]    *See El Paso*, 302 F.3d at 356 *(citing Mobil Oil Corp. v. Brennan*, 385 F.2d 951, 953 (5th Cir. 1967) (describing covenant preventing mineral estate owner from interfering with surface grazing and from placing pipelines above certain depth)).

[49]    739 F.3d at 221.

16

gas pipeline system, which was owned by the promisor.  As the Debtors point out, not only is the

Nordheim gathering fee not secured, but the property subject to the Nordheim Agreements is

subject to preexisting liens held by the Debtors' secured lenders.  Those lienholders did not

approve a conveyance of any interest in the land subject to the liens, and they were not informed

of any interest being created in those properties.[50]  Moreover, while Nordheim and HPIP point to

local recordings filed in connection with their respective Agreements, there was no security

provided to them with respect to their alleged interests in the property.  Contrary to Nordheim's

argument that any lien priority dispute is an issue between the Debtors and their lienholders,[51]

those facts strongly militate against a finding that the covenants at issue burden the property and

thus touch and concern the land.

    *Energytec* is also distinguishable by the fact that the obligation to pay the transport fee in

that case was triggered simply by the flow of gas through the pipeline.  Here, in contrast, the

Nordheim gathering fee is triggered by Nordheim's receipt of gas from Sabine into Nordheim's

own facilities.  Nordheim's gathering fee is thus not as directly tied to the promisor's land as was

the case in *Energytec*.  The Nordheim gathering fee covenant therefore has no direct connection

to or impact on the land or on Sabine's property rights.[52]  Neither the property owner's interest in

the land (as distinct from the products produced from those lands) nor its use of those lands is

affected by such covenants, which, as the Fifth Circuit stated in *El Paso*, do not "compel []or

preclude [the owner]…from doing anything on the land itself."[53]

    Having found preliminarily that the covenants at issue do not (i) readily fit into the

traditional paradigm for horizontal privity of estate or (ii) "touch and concern" the Debtors' land,

---

[50]     Tr. of 2/2/16 Hearing 114:6-9.
[51]     Tr. of 2/2/16 Hearing 119:18-25.
[52]     *El Paso*, 302 F.3d at 346.
[53]     *Id.* at 346, 356-57.

the Court need not further extend its real covenant analysis at this time; accordingly, the Court

has not considered the issue of the parties' intent.

### 3. Equitable Servitudes

Nordheim, in its surreply, alternatively argues that even if the covenants at issue are

personal covenants, they constitute equitable servitudes which cannot be rejected pursuant to the

Bankruptcy Code.  This argument lacks merit.  An equitable servitude is enforceable when the

contracting parties are in privity of estate at the time of the conveyance and a subsequent party

purchases the land with notice of the restriction.[54]  However, in the case of an equitable

servitude, the restriction sought to be enforced must still "concern the land or its use or

enjoyment."[55]  Because the Court has concluded that the covenants at issue do not "concern the

land or its use," the Court also must conclude that the covenants at issue are likewise not

enforceable as equitable servitudes.

### Conclusion

For all of the foregoing reasons, the Court finds that the decision to reject the Nordheim

Agreements and HPIP Agreements is a reasonable exercise of the Debtors' business judgment.

Accordingly, the Court authorizes the rejection of those agreements as of the dates requested in

the Motion.

As required by *Orion*, in granting the Motion, the Court does not make any final

determination as to whether the covenants at issue run with the land or as to any substantive legal

issue other than granting authority to reject the contracts under section 365(a).  The Court does

not at this time grant the Debtors' request to limit the nature of the claims that Nordheim or HPIP

may file against the Debtors' estates, nor does it grant Nordheim's request for what is effectively

---

[54]     *Id.* at 358.
[55]     *Id.*

relief from the automatic stay to pursue remedies against Sabine and its property.  Nordheim and

HPIP may file claims (and, in HPIP's case, amend its previously filed claim) against the

Debtors' estates consistent with what each of them believes its legal rights to be, and those

claims may be resolved promptly through the Debtors' claims administration process.  The

parties are directed to submit an order consistent with this decision.

Dated: March 8, 2016
      New York, New York                 /S/ Shelley C. Chapman
                                                  HONORABLE SHELLEY C. CHAPMAN
                                                  UNITED STATES BANKRUPTCY JUDGE